## In re EFH GROVE TOWER ASSOCIATES, Debtor.

### Bankruptcy No. 89–01187–ATS.

United States Bankruptcy Court, E.D. North Carolina.

Sept. 25, 1989.

Joseph H. Stallings, Raleigh, N.C., Tonny K. Ho, Willkie, Farr & Gallagher, New York City, for debtor.

Sally A. Conti, Raleigh, N.C., for Monumental Life Ins. and Aetna Life Ins.

Gregory B. Crampton, Raleigh, N.C., for Lake Johnson Co.

## MEMORANDUM OPINION AND ORDER DENYING CONFIRMATION AND LIFTING AUTOMATIC STAY

A. THOMAS SMALL, Bankruptcy Judge.

The confirmation hearing to consider the debtor in possession's Second Amended Plan of Reorganization was held in Ra-

leigh, North Carolina, on September 13, 1989.[1] The issue presented is whether the plan proposed by the debtor in possession is "fair and equitable" as that term is used in 11 U.S.C. § 1129(b)(1).

The debtor, EFH Grove Tower Associates, a North Carolina limited partnership, became a chapter 11 debtor in possession when it filed a voluntary petition under chapter 11 of the Bankruptcy Code on February 14, 1989.[2] The debtor's general partner is EFH Grove Tower, Inc., a Delaware corporation, which is part of a financial network owned by Shearson Lehman Hutton, Inc.

The debtor's primary assets consist of three office buildings in Raleigh, North Carolina. All of the buildings are subject to the lien of a wrap mortgage held by Lake Johnson Company ("Lake Johnson"). The balance of the Lake Johnson wrap mortgage is approximately $5,163,000—$2,845,000 to Lake Johnson and $2,318,000 to three lenders [3] each with a first lien on one of the office buildings. The largest building, the Towers One building, was leased to the State of North Carolina, but the lease was not renewed and the building became unoccupied in October, 1988. The debtor could not maintain its interest payments on the Lake Johnson wrap mortgage, the balance of the indebtedness (which was to mature on December 20, 1990) was accelerated, a foreclosure sale was scheduled, and the bankruptcy petition was filed to stay the sale.

The debtor's Second Amended Plan of Reorganization, as modified at the confirmation hearing, provides that cost of administration claims (approximately $175,000) will be paid on the effective date of the plan, the first lien claims of Nonumental, Aetna, and Forsyth will be made according to their terms, and unsecured claims (approximately $59,000) will receive a 65% dividend in two installments. The most drastic alteration under the plan is to the Lake Johnson mortgage. Under the plan, mortgage payments to Lake Johnson would be suspended until January 20, 1991, at which time the debtor would commence making monthly installments (12 at $12,500; 12 at $14,583.33; and, 12 at $16,666.67) until January 20, 1996, when all principal plus interest would be due and payable.

The plan also provides that the debtor's limited partners shall retain their interests, but that confirmation would constitute a release by the limited partners of all claims against the general partner and all of the general partner's affiliates. The general partner is to retain its ownership interest under the proposed plan.

To implement the plan, a loan of up to $1,200,000 will be made by Shearson Lehman Hutton, Inc., an affiliate of the debtor's general partner. The proceeds of the loan will be used to fund the costs of administration, to pay the first mortgages, and to upfit the buildings. The first $600,000 of the $1,200,000 loan is to be secured by a lien with priority ahead of the lien of Lake Johnson; the second $600,000 is to be secured by a lien equal to that of the Lake Johnson loan.[4] The new loan would accrue interest at the federal funds rate plus one percent and would be due and payable in full on December 31, 1992.

The plan was accepted by all impaired

---

1. On June 27, 1989, the court held a hearing to consider the motion of Lake Johnson Company to lift the automatic stay. The parties agreed that all evidence presented at the hearing on June 27th would be considered by the court at the confirmation hearing.

2. The petition was filed in the Southern District of New York, but venue of the case was transferred to the Eastern District of North Carolina on April 28, 1989.

3. The Towers One building is subject to a first lien held by Monumental Life Insurance Company with a balance of $794,000; the Woodoak building is subject to a first lien held by Aetna Life Insurance Company with a balance of $807,000; and the Pinewood building is subject to a first lien held by Forsyth Partners with a balance of $717,000.

4. The Second Amended Plan initially provided that the entire $1,200,000 loan be prior to the

classes,[5] with the exception of Class 4B, consisting solely of the Lake Johnson claim which voted to reject.

The debtor contends that the plan should be confirmed, notwithstanding the rejection of Lake Johnson, under the cramdown provisions of 11 U.S.C. § 1129(b).[6]

For a chapter 11 plan to be confirmable without the acceptance of an impaired class, the plan must meet the requirements of 11 U.S.C. § 1129(b)(1).[7] One of those requirements is that the plan must be "fair and equitable." 11 U.S.C. § 1129(b)(2) sets forth standards which must be met if a plan is to be "fair and equitable," but the requirements of § 1129(b)(2) are not exclusive. A plan may meet the standards of 11 U.S.C. § 1129(b)(2) and still not be "fair and equitable"—and, thus be nonconfirmable. *Matter of D & F Construction Co.*, 865 F.2d 673, 675 (5th Cir.1989); *In re Cheatham*, 78 B.R. 104 (Bankr.E.D.N.C.1987), *aff'd* 91 B.R. 377 (E.D.N.C.1988).

To be "fair and equitable" under § 1129(b)(1) a plan must literally be fair and equitable. The court finds that the debtor's proposed treatment of Lake Johnson in the plan is neither fair nor equitable.

Basically, the debtor is attempting to alter the prebankruptcy bargain which existed between it and its primary creditor, Lake Johnson. Restructuring relationships is the essence of chapter 11 reorganizations, but this court will not approve such a one-sided rearrangement as that proposed by the debtor. Lake Johnson has little to gain from the debtor's proposed plan, yet the risks that the plan imposes upon Lake

Johnson are substantial. The debtor, the debtor's general partners, and the general partner's extended financial family, on the other hand, derive significant benefits from the plan, but accept only minimal risks.

The plan precludes Lake Johnson from exercising its right to foreclose its defaulted mortgage and imposes a payment moratorium until January, 1991. Installment payments will commence at that time, but not in amounts which would reduce the principal amount of the Lake Johnson debt. In fact, the balance of the Lake Johnson indebtedness will be greater when the obligation matures in 1996 than it is at this time. Furthermore, Lake Johnson's junior lien position will be subordinate to more prior debt than presently exists. At least $600,000 of the new $1,200,000 loan to be made by the general partner's affiliate will be superior to Lake Johnson's lien. The terms of the new loan are unspecified, and the maturity date, according to the disclosure statement, is December 31, 1992, which is more than four years prior to the maturity of Lake Johnson's indebtedness.

The debtor maintains that the plan will greatly benefit the debtor because the new loan will provide funds to pay the first mortgages and, more importantly, will permit the debtor to make improvements to the buildings and thus enhance the value of Lake Johnson's collateral. Lake Johnson, however, remains unconvinced. It is true that the new funds are being provided by an affiliate of the debtor's general partner, but, as a practical matter, the risk of repayment of those funds falls on Lake Johnson. If things do not go as the debtor predicts

---

Lake Johnson lien. The plan was orally modified at the confirmation hearing.

5. The two unsecured creditors (with claims totaling $3,997.78) which voted for the plan, voted to accept. The limited partners also accepted the plan by an overwhelming margin—79.5 units ($3,545,700) voted to accept and only 2 units ($89,200) voted to reject.

6. One of the requirements of § 1129(b) is that all requirements of § 1129(a), other than § 1129(a)(8), must be satisfied. The court will not consider the other requirements of § 1129(a), since the court has determined that

the requirements of § 1129(b)(1) have not been met.

7. 11 U.S.C. § 1129(b)(1) provides as follows:
Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

and the building is not rented, there may be inadequate funds to pay the new loan when it matures in December of 1992. In that event, Lake Johnson would have no choice but to pay the prior lien to protect its security. In effect, Lake Johnson would have been forced to fund the costs of the debtor's reorganization. That is simply not fair. The costs of the debtor's reorganization should be borne by those who stand to gain from the reorganization—the general partner and its affiliates which would be released from claims of the debtor's limited partners.

■ The debtor contends that there is sufficient value in the property to protect Lake Johnson's interests. The debtor's appraiser testified that the going concern value of the three buildings at this time is $5,530,000, that the value will appreciate to $7,200,000 in two years, and that the liquidation value of the building is currently $4,450,000. Lake Johnson's expert testified that the going concern value of the buildings is $4,394,000. Both experts have impressive credentials, prepared thorough appraisals, and relied primarily on the income valuation method to arrive at their values. Necessarily, the values depend on assumptions, predictions, and, to some extent, speculation. It is true that these prognostications are made by highly trained professionals, but the professionals disagree and in the absence of more compelling evidence, the court is not willing to require Lake Johnson to suffer the risk which the plan would impose. The court believes that the value of the property lies somewhere between the two values supported by the two experts.[8] In any event, whatever the present value, the court finds that it is not adequate to provide protection against the risks which the plan would inflict upon Lake Johnson.[9] Furthermore, the projected value of $7,200,000 is too speculative to be meaningful.

■ Undoubtedly, the project is managed by an exceptionally fine management company; but even with that expert assistance, the debtor has been unable to find a tenant for the Towers One building. If the building remains unoccupied and the debtor cannot meet its obligations under the plan, Lake Johnson will be entitled to foreclose its lien. If the property does not appreciate in value, Lake Johnson will only realize the liquidation value of its collateral, which, according to the debtor's appraiser, is $4,450,000. If the debtor were to foreclose today it would receive the liquidation value of the collateral now. If Lake Johnson must wait to foreclose, it will lose the present value of the foreclosure proceeds. Although the holder of an undersecured claim is not entitled to adequate protection of its lost opportunity costs prior to confirmation, an objecting undersecured creditor is entitled to have the present value of the collateral maintained. 11 U.S.C. § 1129(b)(2)(A)(i)(II). *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). There is a very real danger that if the plan were confirmed Lake Johnson would lose the present value of its collateral.

In *Matter of D & F Construction, Inc.*, 865 F.2d 673, 675 (5th Cir.1989) the court held that

[a] court must consider the entire plan in the context of the rights of the creditors under state law and the particular facts and circumstances when determining whether a plan is "fair and equitable." *See Spanish Lake Associates*, 92 B.R. 875, 878 (Bankr.E.D.Mo.1988); *In re Edgewater Motel, Inc.*, 85 B.R. 989, 998 (Bankr.E.D.Tenn.1988).

The court has considered the plan and the circumstances of this case, and finds that the plan is far from being fair and equitable. The debtor would have presented a stronger case if it had been willing to

---

8. The debtor's appraiser's income projections may be *too optimistic and are in fact undercut by the debtor's own figures, as reported in the disclosure statement. The forecast of income by the Lake Johnson appraiser are based on a ten-year holding period and may be too low.*

9. Even assuming that the debtor's value of $5,530,000 is correct, that value is not sufficient protection for Lake Johnson's interest because the total secured debt is $5,163,000.

assume more of the risk. It has not agreed to do that. Accordingly, the plan will not be confirmed and confirmation of the debtor in possession's Second Amended Plan of Reorganization is DENIED.

Also before the court is the motion of Lake Johnson to lift the automatic stay.[10] The debtor has not indicated a willingness to modify its plan further, and since the plan is not confirmable, cause exists to lift the automatic stay and the stay is lifted to permit Lake Johnson to pursue its remedies.

SO ORDERED.

---

**10.** In its order of June 28, 1989, the court stated that Lake Johnson's motion to lift the stay would be reconsidered at the confirmation hearing.